UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
CAROLE SMITH,

                Plaintiff,                Case No.    22-CV-4389

 -against-

GLAAD, INC.,                                          **COMPLAINT &**
                                                                     **JURY TRIAL DEMAND**

                Defendant.
---------------------------------------------------------x

      Plaintiff Carole Smith ("Plaintiff" or "Ms. Smith"), by and through her attorneys, Menken Simpson & Rozger LLP, complaining of Defendant GLAAD, Inc. ("GLAAD," "Defendant," or "the organization"), alleges as follows:

## NATURE OF THE ACTION

      1.     Very few organizations advocating for the rights of LGBTQ+ people today can claim the same level of name recognition as GLAAD, the renowned media monitoring organization that, in the words of its own website, "rewrites the script for LGBTQ acceptance."

      2.     For Carole Smith, 62, a long-time fan, supporter, and former board member of GLAAD's, working there was nothing short of a dream job.

      3.     And so, when she applied for a position at GLAAD in the fall of 2021 and underwent several highly successful rounds of interviews, she was overjoyed by the prospect of joining the organization, egged on by a member of senior management whose words all but assured Ms. Smith the job was hers.

      4.     All of that changed on November 30, 2021, when, during a job interview with GLAAD's Chief Strategy Officer, Grant Schneider, Ms. Smith suddenly found herself

1

confronted with a deeply personal and inappropriate question about her personal life and sexual orientation.

5. Twice, despite GLAAD's purported mission of acceptance and equal opportunity, Mr. Schneider asked Ms. Smith *during her interview* whether she "considers herself queer"—a word whose meaning has shifted over time and means different things to different people.

6. The question served two purposes: first, to assess whether Ms. Smith was "too old" for the position, given generational differences surrounding how the word is perceived and understood; and second, whether she was "gay enough" for the position—both, to say the least, impermissible considerations under New York State and City anti-discrimination laws.

7. When Ms. Smith did not give Mr. Schneider the answer he wanted, she was promptly denied the opportunity to join GLAAD's team as Head of Research—a position she was eminently qualified for as a seasoned media research executive with over two decades of experience.

8. Instead, the position was given to a woman roughly 20 years her junior—someone who likely answered Mr. Schneider's question differently.

9. Ms. Smith now brings this action for age and sexual orientation discrimination under the New York State and City Human Rights Laws ("NYSHRL" and "NYCHRL," respectively).

**JURISDICTION AND VENUE**

10. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332. Plaintiff Carole Smith is a citizen of New Jersey and Defendant GLAAD is a Delaware corporation with its headquarters and principal place of business in New York. The amount in controversy also exceeds $75,000.

11. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because Defendant GLAAD resides in Manhattan.

12. Contemporaneous with the filing of this lawsuit, Plaintiff submitted copies of the Complaint to the New York City Commission on Human Rights and Department of Law.

## PARTIES

13. Plaintiff Carole Smith is an adult individual residing in Passaic County, New Jersey.

14. Defendant GLAAD, Inc., is a not-for-profit corporation organized under the laws of Delaware, with its headquarters and principal place of business at 270 Park Ave., 21st Fl., New York, New York 10017.

## FACTUAL ALLEGATIONS

### Ms. Smith's Exemplary Qualifications & Path to GLAAD

15. Over the past two decades, Ms. Smith has made a name for herself in the world of media research with her keen ability to translate complex data into powerful consumer insights, including award-winning insights focused on the LGBTQ community.

16. She has earned two prestigious research awards from CTAM, a marketing organization for media, entertainment, and technology, one of which was for a ground-breaking study specifically focused on the lives of LGBT Americans across the country.

17. She has also excelled as the Vice President of Research at no fewer than seven major media companies, including VH1, CMT, Ion Media, WE tv, BET, Logo TV (which specifically targets LGBTQ+ audiences), and ABC, where she held her first VP role in 1999.

18. Critically, her experience also includes years of service on senior leadership teams.

19. Ms. Smith served as a key member of the senior leadership teams at ABC Daytime, Logo, ION, and WE tv, where she led their research departments and was in charge of quantitative and qualitative research for both television and digital units.

20. She also acted as a strategic advisor to senior leadership teams at VH1, CMT, and BET, where she was in charge of market research and developing and executing research studies on consumer trends.

21. Notably, Ms. Smith was selected to join management leadership programs at both ABC (Simmons College/ABC Developing Managers Program) and BET (BET Thrive Leadership Program).

22. She has also received a television credit for her research efforts on VH1's World Series of Pop Culture, and has given lectures on a variety of topics at numerous research conferences and universities.

23. Beginning in 2005, passionate about the organization's mission, Ms. Smith also served as a board member for Defendant GLAAD.

Ms. Smith Applies for a Position at GLAAD and Aces Multiple Rounds of Interviews

24. In October 2021, Ms. Smith applied for the Head of Research role at GLAAD.

25. The job posting requested "12-15 years of progressively responsible research experience; of which at least seven years were in a senior leadership role leading the research function in the marketing entertainment, media and advertising industries."

26. It also sought candidates with strong experience in qualitative and quantitative research methods, and those who had prior experience at organizations with established connections in the LGBTQ+ community.

27. Ms. Smith had over two decades of relevant experience, ran Logo TV's research department, and had served on the GLAAD board, on the New York Advertising and Communications Network board, and on the Viacom LGBTQ advisory council.

28. In other words, her qualifications immediately made her stand out from the pack.

29. Just two days after submitting her resume, she received an email from Executive Vice President Gwendolyn Pointer, praising her credentials:

> Hi Carole,
>
> I am Gwen Pointer, and I am the Executive Vice President of the GLAAD Media Institute. I had the great privilege of reviewing your resume and accomplishments, as I chart and drive our search for GLAAD's Head of Research. I am beyond impressed with your experience and achievements. Well done for such incredible work!

30. Ms. Smith's first interview with Ms. Pointer took place on November 3 and went exceedingly well.

31. Ms. Pointer promptly scheduled a second interview for the following Tuesday, November 9, and even asked Ms. Smith for her professional opinion on a recent GLAAD report, titled "Accelerating Acceptance."

32. Ms. Smith submitted a detailed review of the report, along with commentary on its media coverage, on November 9.

33. On November 10, when Ms. Smith's second interview also proved to be a success, Ms. Pointer scheduled a third interview, this time with Michael Bowman-Zamora, GLAAD's Senior Director of People, Talent, and Culture.

34. In a November 10 email to Ms. Smith, Ms. Pointer wrote:

> After your conversation/interview with Michael, we'll explore possible next steps. Carole, thanks so much for your interest in the Head for Research role and for knowledge-sharing about GLAAD's research and our work. I love how you think, and I think, if the stars align, your joining us would make us so much better.
> More to come in the coming days and weeks...

35. Notably, prior to Ms. Smith's interview with Mr. Bowman-Zamora, which took place on November 17, Ms. Pointer also advised Ms. Smith not to let HR "insult" her with their salary offer, strongly suggesting that she would get the job.

36. In an email on November 19, Ms. Pointer scheduled her for a fourth interview, this time with Grant Schneider, who she identified as "our Chief Strategy Officer."

37. In the same email, she continued to express her enthusiasm about Ms. Smith joining GLAAD as Head of Research, advising her to "shine" in her interview with Mr. Schneider:

> As you can imagine, we are meeting a wealth of candidates for this role, and just as I hoped, you continue to shine with every conversation with our Leadership Team. Please continue to do so.

<u>"Are You Queer?": Chief Strategy Officer Grant Schneider Inappropriately Probes into Ms. Smith's Personal Life and Sexual Orientation</u>

38. Ms. Smith met with Mr. Schneider on November 30, 2021.

39. For the first 40 minutes of the interview, Mr. Schneider spoke about himself and his role at GLAAD.

40. He informed Ms. Smith that he is extremely close with GLAAD President and CEO Sarah Kate Ellis.

41. He also suggested that he holds considerable influence at the organization, going so far as to say that Ms. Ellis would not have accepted her job at GLAAD if he did not come to the organization along with her.

42. His messaging seemed to be that he was Ms. Ellis's right-hand man.

43. Mr. Schneider also suggested that he had considerable influence over GLAAD's research work.

44. He informed Ms. Smith that he was in charge of some of the research, and that he had recently hired a woman outside of New York to write surveys for the organization.

45. His line of questioning then took an unexpected turn away from GLAAD's work and into Ms. Smith's personal life.

46. Twice, despite knowing that Ms. Smith identifies as a gay woman, Mr. Schneider pointedly asked whether she considers herself "queer."

47. The first time he asked, Ms. Smith responded that she was a gay woman.

48. This, it seems, was not enough. So he asked a second time.

49. Ms. Smith, thrown off guard by the question and shocked that someone would ask something so personal and inappropriate during a job interview, responded by recounting a conversation she had with her daughter in which the word came up.

50. Like many LGBTQ people, Ms. Smith came of age during a time when the word "queer" was not used in the way it is often used now.[1]

51. As a result, though Ms. Smith identifies with the word "queer," she has always been careful about when and where she uses it to refer to herself.

---

[1] *See, e.g.,* Juliette Rochelau, "A Former Slur Is Reclaimed, And Listeners Have Mixed Feelings" (NPR, Aug. 21, 2019) (noting use of the word may be more common among Gen Z and Millennials), available at https://www.npr.org/sections/publiceditor/2019/08/21/752330316/a-former-slur-is-reclaimed-and-listeners-have-mixed-feelings.

52. This, it seems, was not the answer Mr. Schneider was looking for. The question was a litmus test, meant to assess whether Ms. Smith was queer "enough" for the role—or, by a similar token, whether she was "too old" to stay hip with current shifts and trends in the LGBTQ+ community.

53. Notably, both Ms. Pointer and Mr. Schneider referenced Ms. Smith's age at different times during the interview process, noting "you're my age" and "I'm 56, I'm like you."

54. After her interview with Mr. Schneider, Ms. Smith did not hear from anyone at GLAAD until she reached out to Mr. Bowman-Zamora on December 6 for an update.

55. The following day, Mr. Bowman-Zamora informed her that she did not get the job.

56. Ms. Smith found herself wondering whether GLAAD has a policy of asking all of its applicants and interviewees how they identify, or whether she, for whatever reason, was singled out with the question of whether she was "queer."

GLAAD's Bogus Explanation for Its Discriminatory Failure to Hire Ms. Smith

57. On March 11, 2022, Ms. Smith emailed Mr. Schneider, cc'ing Ms. Ellis, to express her disappointment at not getting the job and to offer feedback on what was undoubtedly an inappropriate line of questioning from Mr. Schneider.

58. Ms. Ellis then forwarded her email to Ms. Pointer, who responded with the following on March 23:

> I am disappointed that your conversation with Grant made you feel uncomfortable. I am confident that that was not his intention. Grant was on the interview calls as a consultant to provide you insight about GLAAD's work and to serve as a resource during the interview process. He did not make the hiring decision. I made that decision and I was not aware that this moment happened in your conversation with Grant. More importantly, please know that my decision-making process involved only choosing the best candidate from among a few exceptional research professionals based on who I believe would be best for GLAAD right now based on their skills, experiences, expertise, etc.

59. Up until this moment, Ms. Smith's interview with Mr. Schneider had never been characterized as an informational interview, nor was he ever identified as a "consultant."

60. Quite to the contrary, her meeting with Mr. Schneider was a substantive fourth-round interview for a position that Ms. Pointer had repeatedly characterized her as a top candidate for.

61. It was simply implausible that GLAAD would schedule an informational interview, as Ms. Pointer's email suggested, after three successful interviews with senior leadership.

62. Indeed, Ms. Pointer had explicitly prefaced the interview with Mr. Schneider by telling Ms. Smith that she hoped she would continue to "shine"—strongly suggesting the interview counted for something.

63. On information and belief, the decision not to hire Ms. Smith was made by Ms. Pointer, a full-time GLAAD employee and agent of the organization, with input from Mr. Schneider, also an agent of GLAAD.

64. Despite Ms. Pointer's overwhelming praise for Ms. Smith, GLAAD hired a woman in her early 40s with significantly less experience than her—and who, given their generational differences, likely would have responded to Mr. Schneider's "are you queer" litmus test very differently.

9

65. Though the job posting for Head of Research specifically noted that GLAAD wanted someone with at least seven years of senior management experience, the woman ultimately hired for the role had less than four years of experience as a Vice President.

66. As noted, Ms. Smith has over two decades of senior management experience and has served on multiple senior leadership teams. She also has prior experience in a top research role at an LGBTQ+ television network and was a member of GLAAD's own board.

67. Still, though eminently more qualified for the position, Ms. Smith was passed over for someone 20 years her junior.

68. As a result of GLAAD's discriminatory failure to hire her, Ms. Smith has suffered economic damages and emotional distress in the form of feelings of depression, despondency, loss of confidence, and alienation. She has also suffered from trouble sleeping.

69. Ms. Smith has sought treatment from a qualified mental healthcare provider to address these issues.

## FIRST CAUSE OF ACTION
### Age Discrimination, New York State Human Rights Law
### N.Y. Exec. Law §§ 291 *et seq.*

70. Plaintiff repeats and realleges all of the preceding paragraphs as though fully set forth herein.

71. At all times relevant to this Complaint, Plaintiff was 62 years old and therefore a member of a protected class.

72. Plaintiff applied for and was qualified for the Head of Research position.

73. Because of Plaintiff's actual or perceived age, Defendant rejected Plaintiff for the Head of Research position and offered it to someone approximately 20 years her junior.

74. In doing so, Defendant discriminated against Plaintiff within the meaning of the NYSHRL.

75. Defendant acted with malice or reckless indifference to Plaintiff's statutorily protected rights under the NYSHRL.

76. As a result of Defendant's unlawful conduct, Plaintiff has suffered damages in the form of emotional distress and is entitled to emotional distress damages, punitive damages, attorney's fees and costs, and any such other relief the Court deems proper.

## SECOND CAUSE OF ACTION
### Sexual Orientation Discrimination, New York State Human Rights Law
### N.Y. Exec. Law §§ 291 *et seq.*

77. Plaintiff repeats and realleges all of the preceding paragraphs as though fully set forth herein.

78. Plaintiff applied for and was qualified for the Head of Research position.

79. Because of Plaintiff's actual or perceived sexual orientation, Defendant rejected Plaintiff for the Head of Research position.

80. In doing so, Defendant discriminated against Plaintiff within the meaning of the NYSHRL.

81. Defendants acted with malice or reckless indifference to Plaintiff's statutorily protected rights under the NYSHRL.

82. As a result of Defendants' unlawful conduct, Plaintiff has suffered damages in the form of emotional distress and is entitled to emotional distress damages, punitive damages, attorney's fees and costs, and any such other relief the Court deems proper.

### THIRD CAUSE OF ACTION
### Age Discrimination, New York City Human Rights Law
### N.Y.C. Admin. Code §§ 8-101 *et seq.*

83. Plaintiff repeats and realleges all of the preceding paragraphs as though fully set forth herein.

84. At all times relevant to this Complaint, Plaintiff was 62 years old and therefore a member of a protected class.

85. Plaintiff applied for and was qualified for the Head of Research position.

86. Because of Plaintiff's actual or perceived age, Defendant rejected Plaintiff for the Head of Research position and offered it to someone approximately 20 years her junior.

87. In doing so, Defendant discriminated against Plaintiff within the meaning of the NYCHRL.

88. Defendants acted with malice or reckless indifference to Plaintiff's statutorily protected rights under the NYCHRL.

89. As a result of Defendants' unlawful conduct, Plaintiff has suffered damages in the form of emotional distress and is entitled to emotional distress damages, punitive damages, attorney's fees and costs, and any such other relief the Court deems proper.

### FOURTH CAUSE OF ACTION
### Sexual Orientation Discrimination, New York City Human Rights Law
### N.Y.C. Admin. Code §§ 8-101 *et seq.*

90. Plaintiff repeats and realleges all of the preceding paragraphs as though fully set forth herein.

91. Plaintiff applied for and was qualified for the Head of Research position.

92. Because of Plaintiff's actual or perceived sexual orientation, Defendant rejected Plaintiff for the Head of Research position.

93. In doing so, Defendant discriminated against Plaintiff within the meaning of the NYCHRL.

94. Defendants acted with malice or reckless indifference to Plaintiff's statutorily protected rights under the NYCHRL.

95. As a result of Defendants' unlawful conduct, Plaintiff has suffered damages in the form of emotional distress and is entitled to emotional distress damages, punitive damages, attorney's fees and costs, and any such other relief the Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

a. A declaratory judgment that the acts and practices complained of herein are in violation of the NYCHRL, N.Y.C. Admin. Code §§ 8-101 *et seq.*, and NYSHRL, N.Y. Exec. Law §§ 291 *et seq*.

b. A judgment directing Defendants to award Plaintiff emotional distress damages;

c. Attorneys' fees and costs;

d. Pre- and post-judgment interest, as provided by law;

e. Punitive damages; and

f. Such other relief as this Court deems necessary, just, and proper.

## **JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: May 27, 2022
New York, New York

        MENKEN SIMPSON & ROZGER LLP

        *s/ Bruce E. Menken*
        *s/ Raya F. Saksouk*
        80 Pine St., 33rd Fl.
        New York, NY 10005
        Tel.: 212-509-1616
        Fax: 212-509-8088
        bmenken@nyemployeelaw.com
        rsaksouk@nyemployeelaw.com

        *Attorneys for Plaintiff*