1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CAROLE SMITH,

4                   Plaintiff,                 New York, N.Y.

5            v.                                22 Civ. 4389 (DLC)

6   GLAAD, INC.,

7                   Defendant.

8   ------------------------------x          Teleconference

9                                            June 1, 2023
                                             3:00 p.m.
10
    Before:
11
                         HON. DENISE COTE,
12
                                             District Judge
13

14
                              APPEARANCES
15

16
    MENKEN SIMPSON & ROZGER, LLP
17        Attorneys for Plaintiff
    BY:  BRUCE E. MENKEN
18

19  SHEPPARD MULLIN RICHTER & HAMPTON
         Attorneys for Defendant
20  BY:  BRIAN D. MURPHY

21

22

23

24

25

1            (The court and parties appearing telephonically)

2            THE COURT:  Good afternoon.  This is Judge Cote.

3   Smith v. GLAAD, 22 Civ. 4389.

4            Is plaintiff's counsel ready to proceed?

5            MR. MENKEN:  Yes.  Good afternoon, your Honor.  It's

6   Bruce Menken, Menken Simpson & Rozger.

7            THE COURT:  Thank you.

8            Is counsel for the defendant ready to proceed?

9            MR. MURPHY:  Yes, your Honor.  Good afternoon.  This

10  is Brian Murphy from Sheppard Mullin Richter & Hampton.

11           THE COURT:  Thank you.  I have two letters.  The first

12  one was from defense counsel dated today, and it raises an

13  issue about whether a deposition of an additional person needs

14  to be taken.  That's the deposition of Ms. Marra.  As I

15  understand it, the plaintiff seeks to take Ms. Marra's

16  deposition.

17           Then I received just a few minutes ago a letter from

18  plaintiff's counsel with respect to a request for certain

19  telephone records.  We'll deal with that in a moment.  Let's

20  just deal with the deposition issue first.

21           I have defendant's opposition to the plaintiff's

22  request to take Ms. Marra's deposition.  So Mr. Menken, I want

23  to give you an opportunity to be heard.

24           MR. MENKEN:  Sure.  Your Honor, first let me say that

25  the proposal to depose Ms. Marra was made several months ago.

1    I spoke to Mr. Murphy about it, and there was initially not an

2    objection.  Then there was an objection after I noticed the

3    deposition.

4         And I might add that as a sort of a compromise

5    courtesy, I let Mr. Murphy know that the deposition would be

6    remote, rather than in person, which is the way the other three

7    depositions were conducted.  And also we would limit it to 90

8    minutes.  And I told him that plaintiff would not be present

9    during that remote deposition.

10        And then there is a reference in Mr. Murphy's letter

11   that my client was agitated and or some description that there

12   might be some problem if Ms. Marra were deposed and my client

13   were present.  My client's not really angry.  She's just really

14   committed and upset.  And to alleviate the potential concern,

15   she's not going to be present during the other 90-minute remote

16   deposition that we're seeking.

17        Significantly, there are three or four issues that I'd

18   like to question Ms. Marra about, that again, I think I could

19   obtain that information in short order.  One is a really

20   important question, which is whether she was asked if she

21   considers herself queer.  This was a question that the chief

22   strategy officer Grant Schneider asked my client not once, but

23   twice, during her fourth job interview.

24        Taking a step back, your Honor, the reason why the

25   questions asked by the employer are important in a case like

1          this, which is a failure to hire case, is that, as you know,

2          plaintiff's got to show intent to discriminate, and courts have

3          obviously held that showing intent can be a challenge at some

4          times, and it could be slippery at times in discovery cases.

5                   So therefore, the questions that an employer asks a

6          witness clearly reflects the intent of the employer and what

7          criteria it deems important when deciding who to hire and who

8          not to hire.

9                   So when the chief strategy officer of -- the

10         employer's chief strategy officer asks an applicant for a job,

11         who has three prior interviews, if she considers herself queer,

12         twice, that's quite telling.  If he doesn't ask a person who is

13         20 to 25 years younger, that's also quite telling.

14                  We need to be able to ask Ms. Marra what she

15         remembered about her interview by Mr. Schneider, and whether he

16         asked her that question.

17                  So that's the first -- that's the most important part

18         of the proffer in the deposition of Ms. Marra.

19                  There is also testimony that Ms. Pointer, the decision

20         maker for GLAAD, considered Ms. Marra's international

21         experience as a factor in deciding to hire Ms. Marra and not

22         Ms. Smith.  Beside the fact it's not in the job listing, and it

23         is not in the job description, we still want to ask Ms. Marra

24         whether she had international experience or international

25         research experience.

1          Lastly, there is a certain specific period of time,

2    November 30, when my client was interviewed by the chief

3    strategy officer and asked that unlawful question twice, and

4    December 3 when I believe there was an oral communication

5    between the employer and Ms. Marra where there was a new offer

6    conveyed to Ms. Marra, and she then verbally accepted the job.

7          It's important to note that the day before my client

8    was interviewed on November 30 by the chief strategy officer,

9    Ms. Marra rejected GLAAD's job offer.  So, as of November 30,

10   there was no job offer on the table when Mr. Schneider, the

11   chief strategy officer, asked my client that illegal question

12   not once, but twice.

13          So, again, we believe that this deposition not only is

14   in good faith, and seeks to elicit critical information that

15   we're entitled to.

16          THE COURT:  Before I turn to Mr. Murphy, Mr. Menken,

17   do you have Ms. Marra's résumé or application?

18          MR. MENKEN:  We have her résumé.

19          THE COURT:  And it does not list international

20   experience?

21          MR. MENKEN:  Correct, it does not.

22          THE COURT:  So you have no basis from the documents to

23   understand that Ms. Marra had any international experience?

24          MR. MENKEN:  That's correct.  However, there was a

25   presentation during the interview process that Ms. Marra gave

1    to Mr. Schneider, the chief strategy officer, and Ms. Pointer,

2    the decision maker, and according to Ms. Pointer's testimony,

3    Ms. Marra said that she had international experience, and that

4    was a factor that Ms. Pointer and GLAAD took into consideration

5    when making a decision to offer and hire Ms. Marra.

6              THE COURT:  Thank you.

7              Mr. Murphy.

8              MR. MURPHY:  Thank you, Judge.  So I'll take those in

9    order.

10             First, Mr. Menken would like to explore whether

11   Ms. Marra was asked if she was queer during her interview with

12   Grant Schneider.  Mr. Schneider has already testified -- two

13   things.  Mr. Schneider has acknowledged having asked the

14   question during plaintiff's interview, and it is slightly

15   outside the scope of what we discussed, but he had a lot of

16   explanation for it and how it was contextual, given that GLAAD

17   is an LGBTQ organization advancing LGBTQ interests.

18             Two, he already acknowledged that he did not ask that

19   question of any other applicants, because it was not in the

20   context of the conversation with any other applicant, including

21   Tristan Marra.

22             So, it is undisputed as it stands that she was not

23   asked that question.  And if Mr. Menken's goal is to explore or

24   to establish, I guess, differential treatment as between the

25   two, well, it is established, based upon the current record, at

1    least vis-a-vis the asking of that question.  So I don't see

2    how that is relevant.  I do think if that is ultimately

3    important to Mr. Menken, that could be answered through much

4    less intrusive or burdensome means, such as an interrogatory.

5    But that remains to be seen.

6            Two, on the issue of experience, and I don't have the

7    full transcript in front of me right now, but a few points I'd

8    like to raise.  One, as set forth in our letter, all three

9    witnesses that have already been deposed have spoken glowingly

10   about plaintiff's experience.  She had certainly

11   chronologically or orally much more experience just in the work

12   force and in media and as well as involvement with LGBTQ

13   issues, because she's been in the work force longer.  The

14   testimony is uniform that she was an exceptionally qualified

15   candidate.

16           Two, Ms. Pointer in particular and I can't recall --

17           THE COURT:  Excuse me, Mr. Murphy, one second.  You

18   referred to the plaintiff having a lot more experience.  Did

19   you mean to refer to the plaintiff or Ms. Marra?

20           MR. MURPHY:  No, I meant to refer to the plaintiff.

21           THE COURT:  Thank you.

22           MR. MURPHY:  Yes.  It is a long way of saying there is

23   no dispute in this case that the plaintiff was qualified for

24   the position.  The ultimate issue, and there is extensive

25   testimony on this from Ms. Pointer, the decision maker, is to

 1  how she evaluated the different types of experience they had.

 2  One component of which was Ms. Marra's employment with one of

 3  her prior employers.  She had done some research concerning

 4  international global trends.  Again, I'm not aware off the top

 5  of my head of the specific issue, but pertaining to global

 6  trends pertaining to the LGBTQ movement.  So, there is

 7  extensive testimony, and I think that's really the relevant

 8  issue that Tristan Marra can provide no testimony about, which

 9  is how did GLAAD evaluate the qualifications.  What did GLAAD

10  consider important.  Not whether she had it or not.  And

11  Tristan can provide -- Ms. Marra can provide absolutely no

12  testimony on that, because it is undisputed she was not party

13  to the process by which her candidacy or plaintiff's candidacy

14  was evaluated.

15         The third proposed area of questioning is around I

16  guess the timeline of an offer and an acceptance, and I think

17  Mr. Menken is being very precise, but I think it creates a

18  misleading view of the world.

19         So, what had occurred from a timing perspective is

20  that plaintiff was interviewed after GLAAD had narrowed down a

21  list of candidates to some proposed finalists.  The plaintiff

22  underwent two interviews before the third allegedly problematic

23  interview on November 30.  GLAAD extended, I think it was eight

24  days before this interview, November 22, extended a verbal

25  offer of employment to Ms. Marra.  That offer was not accepted

1    until approximately December 3.  What happened in the interim

2    was not a rejection of the offer or a withdrawal of the offer.

3    What happened was a salary negotiation.  While Mr. Menken is

4    correct that the original terms of the proposed offer were

5    rejected, they were rejected along with the message, hey, I'm

6    interested in this position, I need a couple more dollars

7    before I accept.  So, that is what transpired there.

8            I see again, since there is no dispute that the offer,

9    you know, GLAAD came to the decision, and that's what this case

10   is about, was the decision problematic.  GLAAD came to the

11   decision to extend an offer to the successful candidate seven

12   or eight days before the interview occurred where the allegedly

13   problematic statements were made.  That's all that's relevant.

14   Whether there was salary negotiation or whether the deal was

15   not consummated until three or two days after this allegedly

16   problematic interview is irrelevant.

17           And I don't believe, in fact, there is no testimony

18   that Ms. Marra can provide that would be anything other than

19   cumulative at best, since this all exists in e-mail form.  We

20   have e-mail confirmations of when the offer was made, we have

21   e-mail confirmations of the salary negotiation, and we have

22   e-mail confirmations of the acceptance of the offer.

23           So I think it is problematic or unnecessary to depose

24   Ms. Marra for at best cumulative information.

25           So, your Honor, that's my response to the points

1    raised by Mr. Menken.  I'm happy to address some of the other

2    concerns we have, but I don't want to go too far afield.

3         THE COURT:  So I think let's stay focused on whether

4    or not the plaintiff can take Ms. Marra's deposition.

5         And Mr. Menken, it seems to me the only potentially

6    relevant issue here is whether or not Ms. Marra had

7    international experience, and I'll let you put an interrogatory

8    to her with respect to whether or not she discussed any

9    international experience during the interview process, such

10   that you would be able to know whether or not the decision

11   makers were being frank with you when they said they took that

12   into account.  But I don't think there is a need for another

13   deposition.

14        MR. MENKEN:  Your Honor, I want to add one thing, your

15   Honor, which is that Mr. Murphy just said in argument, okay,

16   that Mr. Schneider said he did not ask Ms. Marra the queer

17   question.  That's not what his testimony was.  His testimony

18   was he did not remember.  He did not know.  So, if in fact the

19   Court is prohibiting me from deposing Ms. Marra, at a minimum,

20   maybe the defendant wants to stipulate in a document, in an

21   affidavit that GLAAD or any of its representatives did not ask

22   Tristan Marra whether she considered herself queer.

23        THE COURT:  So, let me ask you one question,

24   Mr. Murphy.  Are you planning to call Ms. Marra as a trial

25   witness?

1          MR. MURPHY:  No, your Honor.  Not at the present time.

2          THE COURT:  Okay.  So I'm going to let the plaintiff

3    depose Ms. Marra, should the defendant decide to call Ms. Marra

4    as a trial witness.

5          So, we have a court reporter here, so if things

6    change, and in the pretrial order the defendant identifies

7    Ms. Marra as a trial witness, I am going to give the plaintiff

8    an opportunity to take her deposition at that time.

9          Let's turn to this other issue about the subpoena for

10   phone records.  Mr. Murphy, have you had a chance to look at

11   Mr. Menken's letter of today about the six-day period for phone

12   records for two individuals?

13         MR. MURPHY:  Yes, your Honor, and I told Mr. Menken in

14   advance that I wouldn't object to it being brought up on this

15   conference, because he and I have discussed the issue recently.

16         THE COURT:  Did you wish to be heard, Mr. Murphy, on

17   that?

18         MR. MURPHY:  Yes, your Honor.  Briefly.

19         So again, there is the timeline I referenced before I

20   think is relevant.  Just by way of reminder, plaintiff alleges

21   that the problematic question was asked in an interview with

22   Grant Schneider on November 30, and the ultimate allegation is

23   her response to that question informed GLAAD's decision somehow

24   in not hiring her.

25         However, and I don't have every transcript up in front

1  of me, and, Bruce, if I'm incorrect, I apologize.  Please

2  correct me.  But I do believe all three witnesses have already

3  testified that none of them communicated with Grant Schneider

4  by phone, text message, or otherwise, following that

5  November 30 meeting, other than one witness saying, I believe

6  Ms. Pointer saying, she asked him how did it go, and he said

7  the plaintiff is a great candidate.  Something very

8  perfunctory.

9          They've all been consistent in their sworn testimony.

10  They did not have any text, any e-mail correspondence about the

11  substance of this allegedly problematic interview.

12          And from where we stand, that's a big problem for

13  plaintiff's case, because if this interview did not play any

14  role in the decision-making process, if no one was aware of it,

15  then of course it could not have influenced the decision.

16          Frankly, from GLAAD's view, we already know or believe

17  that it could not have influenced GLAAD's decision-making

18  process, because it extended an offer to Marra eight days

19  before this allegedly problematic interview.  So, we can put

20  that aside though, and put aside that the testimony is uniform.

21          There have also been RFPs, requests for production, in

22  this case asking for all communications -- text, e-mail,

23  otherwise -- related to the allegations in the complaint,

24  related to plaintiff, related to the interview with Grant

25  Schneider.  And we have searched.  I haven't physically picked

1 up anyone's phones, but I have been working with my client for

2 months at this point, I've represented them for years on a pro

3 bono basis, and I have every confidence they took my direction

4 and searched their phones for records, text messages that would

5 have been responsive to requests for production that are

6 ultimately the same as these interrogatories, for the most

7 part.

8          We've represented now in this case through written

9 discovery responses that we don't have those.  They are not in

10 our possession, meaning, as far as we know, they don't exist.

11 Certainly I don't have them.  And the client's represented they

12 don't.

13          So now, for the interrogatories, plaintiff wants

14 provider information I think because he simply doesn't believe

15 us.  And Mr. Menken and I get along just fine in this case,

16 we're very courteous with each other.  But ultimately, that can

17 be the only explanation for these interrogatories is he doesn't

18 believe what the witnesses have testified to under oath and the

19 representations I've made as an attorney admitted before this

20 court in responding to other discovery requests.

21          So, I think it's belaboring the point.  It is a bit

22 intrusive to seek the personal phone records through the

23 providers, whatever the mechanism ultimately he intends to

24 proceed by, to challenge something that at this point is

25 undisputed both by the witnesses and by me as their

1   representative that those records don't exist.

2           THE COURT:  So Mr. Menken, did you want to be heard?

3           MR. MENKEN:  Please.  Your Honor, first with regard to

4   the first issue and the deposition.  For summary judgment

5   purposes, I think I need a stipulation to sit for the

6   defendants to sign that Ms. Marra was not asked the queer

7   question.  And I'm hoping the Court will so order that.

8           THE COURT:  No, I'm not going to require the parties

9   to stipulate.  If there is a summary judgment motion, you can

10  make your argument.  Thank you.  But, we've moved past that.

11          I'm sorry?

12          MR. MENKEN:  With regards to the interrogatories, I'd

13  like to respond, if I may.

14          THE COURT:  Yes.

15          MR. MENKEN:  Okay.  Thank you.

16          Mr. Murphy and I have been around long enough to know

17  that just because a witness testifies to something and says

18  something, does not necessarily mean it's accurate, does not

19  necessarily mean that that witness's memory is on point.

20          So, with regard to the interrogatories, they are not

21  asked to harass, and they are completely relevant and critical

22  to the case.  Mr. Schneider was personally asked by Ms. Pointer

23  to interview my client.  Mr. Schneider was intimately involved

24  in interviewing the other candidate, Ms. Marra.  Okay.  And on

25  November 30, he asked my client a question that's prohibited

1          under documents produced by GLAAD when it describes what is

2          proper questions, what are proper questions for an interview.

3          So, he admits asking that question on November 30, and from

4          November 30 to December 3, we're supposed to believe that he

5          and Ms. Pointer had no communication at all.

6                    And the reason why it's obvious that he had had some

7          communication is because on Monday, December 6, at 9:30 in the

8          morning, the first workday after there was a verbal offer and

9          acceptance to Ms. Marra, Ms. Pointer sends a private personal

10         e-mail to Mr. Schneider saying, great news, Tristan accepted

11         the job as head of research. Woo-hoo, thanks for the support,

12         guidance, and constant encouragement. Grateful. More to come.

13                   It really is strong evidence to show that between

14         November 30 and December 3, Mr. Schneider communicated with

15         Ms. Pointer and provided her his feelings and opinion on my

16         client, Carole Smith's candidacy for the job. And considering

17         he is the chief strategy officer, he's a part of the executive

18         team, he was specifically asked by Ms. Pointer to interview my

19         client, I can't believe that Ms. Pointer would not want to know

20         what Mr. Schneider felt about my client, and what his opinion

21         was of her candidacy. It just doesn't make any sense, it's

22         preposterous, and of course they are going to testify that he

23         didn't call her. And I don't want to suggest that someone is

24         lying, but it might very well be that. Maybe he forgot.

25                   THE COURT: So --

1          MR. MENKEN:  So it tests that testimony.  I have a

2    carefully crafted and tailored interrogatory, and all I am

3    going to get -- I'm not going to get the narrative of the call

4    or the narrative of the text.  It is just going to be an

5    indication of whether there was a call between the two parties,

6    or calls, and whether there were texts between the parties.

7          THE COURT:  So Mr. Menken, I think you put your finger

8    on the problem, that these are all people who work in the same

9    business together and rely on each other.  The phone records

10   that you seek aren't going to reveal what the substance of any

11   conversation was, even if they had contact with each other.

12   The message you described of December 6 does not indicate that

13   there was any communication in the preceding days or any

14   particular period of time.

15          Counsel are able to argue inferences to the jury, if

16   it gets to that point.  But any substantive communications, to

17   the extent that a record exists, you'll receive that in

18   discovery.  I am not going to require the parties to turn over

19   their personal identifying information to the plaintiff or

20   allow you to get their phone records for that, even though it

21   is a limited period of time.

22          Counsel, I know you've worked hard with respect to

23   discovery so far.  I'm glad you're towards the very end of this

24   process.  You have a schedule for any summary judgment motion.

25          Let me ask you, Mr. Murphy, do you expect to bring

1  such a motion?

2      MR. MURPHY:  I believe so, your Honor, as it stands

3  right now.

4      THE COURT:  Okay.  If you decide not to, that's just

5  fine.  I don't expect the plaintiff to bring a summary judgment

6  motion.  In these cases usually it is the defendant, but let's

7  set a schedule.

8      If there is going to be no summary judgment motion,

9  please let me know by July 21, and then we'll get out a further

10  order with respect to a pretrial order schedule, so we can get

11  this case tried efficiently and quickly for you.

12      Thank you all, counsel.  I hope you have a very good

13  summer.  Good luck.

14      MR. MENKEN:  Thank you.

15      MR. MURPHY:  Thank you.

16      (Adjourned)

17

18

19

20

21

22

23

24

25